[No. 3986.   Decided April 3, 1902.]

CLEOPATRA MINING COMPANY, *Respondent,* v. GEORGE W. DICKINSON *et al., Appellants.*

MINING LEASE — BREACH OF CONTRACT — MEASURE OF DAMAGES.

The measure of damages for breach of a contract of lease of mining property through the abandonment of the premises by the lessee prior to the expiration of the lease because it could not be profitably mined would be compensation for whatever loss the lessor could be shown to have sustained by reason of the non-performance of the contract, where the property leased was a partially developed mine, which the lessee was to develop and operate during a tenancy of five years, providing necessary machinery therefor, which was to be paid for out of the profits and become the property of the lessor at the end of the term, and the net profits be divided between them; and, it being apparent that the real consideration for the lease was the expectancy of both parties that the mine could be worked at a profit, there could be no recovery by the lessor for failure to develop the mine or furnish the stipulated machinery, when the lease was abandoned because of the worthlessness of the ores.

Appeal from Superior Court, King County.—Hon. WILLIAM R. BELL, Judge. Reversed.

*Struve, Allen, Hughes & McMicken* and *Shank & Smith,* for appellants.

*Preston, Carr & Gilman,* for respondent.

The opinion of the court was delivered by

REAVIS, C. J.—Action for damages alleged to have been sustained by breach of contract between respondent, as lessor, and appellants, as lessees, of mining property in King county. The material stipulations of the contract are as follows:

"1.    That said lessor hereby leases, demises and delivers over to said lessees the possession of all the property, including quartz mining claims, owned by said lessor on and near Miller river, in King county, Washington, with surface ground, dump, tramways, water rights, mill sites, tunnel openings, tunnel sites and likewise all dips, spurs, angles, metal ores, gold and silver bearing quartz, rock and earth thereon, and all rights and privileges and franchises thereto incident, appertaining and appurtenant, and therewith usually had and enjoyed. Said lease, demise and grant to be and to continue from the date of this agreement, and to end on the 27th day of October, 1904.

"2.    That said lessees shall have, during the said term, the exclusive right to mine, ship, and treat any and all ores and minerals from said mining property, and shall also have the right and privilege to furnish any and all kinds of machinery, of any nature whatsoever, for treating low grade and other ores, and shall in all ways have the exclusive possession and privilege of working said property as they deem most expedient and practical, and most advantageous to the interests of all parties hereto."

The third article is, in substance, that within ten days from the date of the agreement the lessees shall pay $1,800 in cash of indebtedness of the lessor, and a balance due by lessor for a tramway already contracted to be furnished for the mine, and construct all necessary snow sheds for

the protection and use of the tramway; and the lessees covenant to furnish and install, ready for use on the property, not later than March 1, 1900, a hoisting plant, to be operated by steam or compressed air, sufficient to sink 1,000 feet on said mine, and to furnish within twelve months from the date of the contract certain ore cars and rails for trackage in the mine, and drills, shovels, hammers and some steel wire for timber tramway from hillside to the mine, added quarters for additional workmen, water pipe and galvanized pipe, and a railroad switch to connect the mine with the Great Northern railway. Article 4, in substance, provides that the lessees shall within one year from date deliver and have installed on the premises a four drill, water-power, compressed-air plant, of the capacity to furnish not less than ninety pounds of pressure at the tunnel to two No. 3 drills for the purpose of working a lower tunnel, to be known as "No. 3 Tunnel," the plant to be completed with all necessary air pipes and other fittings; and the lessees covenant that they will drive said tunnel, not less than five feet wide nor less than seven feet high, for a distance of 800 feet towards or into the ledges on the property; that they will begin such tunnel within thirty days from the date of the lease, and will vigorously prosecute the same by hand work until the compressed-air plant is ready, after which they will continuously prosecute the same with the power plant, barring delays from accidents and condition of the weather.

"5. That said lessees, their executors, administrators, or assigns, shall make the said lessor detailed statements of all ores shipped and treated, and of all work done and expenses thereof, together with all expenditures, and furnish copies of vouchers (the originals to be shown on demand), on the 15th day of each and every month, for the previous month's operations.

"6.    That said lessees, their executors, administrators and assigns shall thereupon, on the 15th day of each and every month, during the continuance of this lease, pay over to the said lessor, its successors or assigns, fifty per cent. of all net proceeds resulting from the sale of, the smelting returns or profits of ores shipped, sold, treated, or smelted, the above sum of eighteen hundred dollars, and all expenses of transportation, mining, and charges for such shipping and the smelting or treating of said ores, and of boring the said eight hundred feet of the said No. 3 tunnel, when they have actually accrued, to be first deducted. The basis of such settlement and payments to be the smelting returns received from smelting of said ores;   the said smelter returns to be furnished in duplicate, one each for the lessor and lessees.

"7.    And it is further expressly agreed between the parties hereto that the cost of all machinery or appliances delivered, placed, or erected for the purpose of mining or treating the said ores on the property of said lessor by the lessees, their executors, administrators, or assigns, shall be deducted, and reimbursed to the said lessees, their executors, administrators, or assigns before the division of any profits, or the payment of the said fifty per cent to the lessor; provided, always, that there shall be no deduction for the cost of machinery or appliances until the same shall have been incurred."

The eighth article provides that lessees shall keep the properties free from debt and incumbrance, and pay the operating expenses on the 15th day of each month for the preceding month.

"9.    It is further expressly covenanted and agreed between the parties hereto that if said lessees, their executors, administrators or assigns shall fail to erect and install the hoisting plant above referred to by March 1st, 1900, or the compressed-air plant, above referred to, within one year from the date of this agreement, that in either of such events, this lease shall be at once forfeited, and said lessor, its successors, or assigns, shall have the right to re-enter

and re-possess said property hereby leased, as if this lease had never been made; and it is further covenanted and agreed that upon the termination of said lease, either by forfeiture or time limitation, all tools, buildings, appliances, and machinery now on, or which may be hereafter erected or placed on or adjacent to, said property for the purpose of operating the same under this lease, together with all ores mined, but not delivered at the railway, shall revert to and become the absolute property of the said lessor, free from all claims of the said lessees, their executors, administrators, or assigns, or the executor, administrator, or assigns of either of them."

The tenth article provides that there shall be no deduction from the proceeds of the ore shipped or smelted for other than the usual and necessary superintendence, the total amount of which shall at no time exceed $400 per month, unless agreed to by the president of the lessor company, and that the lessor shall have the right at any time during the continuance of the term to enter and inspect the working of the mine. By the fourteenth article it is provided that the lessees shall execute a bond to the lessor in the sum of $10,000 for the faithful performance of the contract. The contract was executed on the 28th of October, 1899. The defendants entered into possession of the mine under the contract, and continued therein until the 18th day of May, 1900, when they relinquished the property and abandoned the contract. The complaint alleged the execution of the contract, the entry of the defendants into possession of the mine under its terms, the abandonment of the mine and the breach of the contract, and that respondent had faithfully performed all the terms and conditions of the contract obligatory upon itself, and damages for breach of the contract were laid at $30,847.39. The answer of appellants admitted the execution of the contract, the entering into possession of the

mine, and their abandonment of the working on the 18th of May, 1900, but denied that plaintiff is damaged by reason of such abandonment, and then set up two affirmative defenses by way of counter-claim: (1) That, when defendants entered into the lease, plaintiff owned upon the premises a certain quantity of ore already mined, consisting of about 125 tons, stored in one of the drifts or tunnels; that it was stored in such manner that, receding from the entrance, it ascended to the roof, and, a few feet behind, filled and utterly choked the drift. That in point of fact the ore was not uniform, but of two distinct kinds. That one kind was deposited at the entrance, and up to the roof on all sides. This was of high grade, worth $60 per ton, but consisted of only eighteen tons. All the remainder of the 125 tons was behind it and concealed by it, and this remainder was of low grade, of the value of only $8 per ton, and would not pay for its transportation and treatment. That the drift had only the one entrance. That the ore, as stored, was placed there by the plaintiff company, and that plaintiff at all the times knew that the quantities and values of the two kinds of ores so stored were as before stated, and knew it was placed in the drift in the manner described. That defendants, before entering into the lease, proceeded to examine the premises and the ore stored in the drift, and they selected samples of the ore, but, by reason of the manner in which the high-grade ore was placed before the low grade, they were unable to detect the presence of any but the high grade. That defendants at the time of executing the lease fully believed that the ore in the drift aforesaid contained 125 tons of high-grade ore, as above mentioned, and relied upon that belief, and would not have executed the lease if they had not so believed. That plaintiff did not advise defendants, although aware of defendants' belief as to the quality of

the ore, but encouraged the defendants to believe that the ore was all high grade. That these statements defendants believed, and by reason thereof rested satisfied with their own examination of the ore in the drift. That these statements were made by the plaintiff when defendants were in negotiation with them which resulted in the execution of the lease, and were made by plaintiff for the purpose of suppressing the true facts concerning the ore in the drift, and of discouraging further investigation by defendants, and of giving to defendants an exaggerated and inflated value of the mine. That defendants, relying upon such statements, executed the contract, and expended upon the mine the sum of $25,000. That the mine cannot be worked at a profit, and the lease is worthless to defendants, and defendants have been compelled to abandon the same. And damages are asked against plaintiff for the deception and fraud. The second affirmative defense alleges the execution of a $10,000 bond by appellants, and its delivery to plaintiff, and that it was understood that, in consideration of this security, plaintiff should look solely to the bond for damages upon any breach of the contract; and defendants demanded judgment for $25,000 on their counterclaim. Upon the trial of the cause the jury returned a verdict for $22,308 in favor of plaintiff.

1.    The errors assigned by appellants may be classified under two heads: (1) The measure of damages; (2) the exclusion from the jury of the issues and proofs of fraud. Upon the issue of fraud some testimony was tendered by appellants and excluded. Some testimony was admitted, but before the submission of the cause to the jury the court withdrew the two affirmative defenses and counterclaim, and submitted alone to the jury the assessment of plaintiff's damages. A careful consideration of the evidence tendered, as well as that given upon the issue of

fraud and deceit, leads us to the conclusion that the withdrawal of this defense from the consideration of the jury ought not to be disturbed. It appears that appellants made a thorough and complete examination of the mine. The statements made by the president of the lessor company and other officers, taken at their face value, and in connection with the circumstances surrounding them, are insufficient to require the consideration of the jury.

2.   But the important controversy arises upon the rule for the measurement of damages given to the jury. The second instruction of the court was:

"I charge you that it is not material in this case how much money the defendants may have expended in the development of the mine in question, nor is it material whether the mine is of great or of small value. You are simply to determine what has been the plaintiff's damage by the failure of the defendants to carry out the terms of the lease, and you have no right to offset against this damage any amount that the defendants may have expended during the time that they were operating under said lease. The plaintiff is entitled to recover its damages under the rules that I shall hereafter give you, without any offset or deduction on account of expenditures made by the defendants in the operation of the mine."

In the third instruction the court charged the jury, in substance, that the contract provided that the lessees should within one year from the date deliver the four drill, water-power, compressed-air plant, and drive the tunnel as described for the distance of 800 feet; that 'not later than March, 1900, they should furnish and install the hoisting plant and all the other appliances mentioned in the contract; and that if it should be found from the evidence that the defendants had not delivered such air plant and hoisting plant, and constructed the tunnel as mentioned, plaintiff was entitled to recover such sum as

it would cost to deliver and install said plants, and to dig such tunnel; and, generally, the court charged that whatever machinery, appliances, tools, etc., are provided in said lease to be furnished and placed upon said property which were not so placed, the defendants are liable to the plaintiff for the reasonable cost of placing said appliances, machinery, and tools as they are agreed to be placed by the lease in question.

The rights of the parties must be determined by the interpretation of the contract, and in the light of the circumstances and conditions surrounding them. Prior to the 28th day of October, 1899, the lessor was the owner of certain mining property situated in the Cascade mountains, upon which certain development work had been done. Several hundred feet of tunnels and cross cuts had been made, and at least one winze sunk to the depth of some fifty feet from the lower tunnel. An ore chute had been disclosed of about eighty feet in length at the point where it was intersected by the main tunnel. A few carloads of ore had been shipped, showing very fair values. A considerable amount of ore taken by the lessor from the property in the course of its development work had been stored in one of the cross-cut tunnels. At the breast and upon the surface of this ore, where it was exposed, good values were indicated. As the result of the development work done, and in the light of the value shown by the ores exposed to examination, there was promise of a mine which, when properly opened and developed could be operated at a profit. The lessor desired to contract with the lessees to assume the labor and responsibility, and advance in the first instance the necessary funds for the development and operation of the mining claims. The lessees desired to lease and develop the mine. It is apparent, from the surrounding circumstances and view point

of both parties to the agreement at the time of its execu-
tion that the profitable development of the mine and its
operation thereafter were an expectancy. It will be ob-
served, the sixth article of the agreement contemplates that
all the expenditures made by the lessees in their develop-
ment work and expenditures for and in installing machin-
ery and digging the 800-foot tunnel should be reimbursed
by the first profits taken from the mine. The agreement
between the parties further specifies the methods of work-
ing the mine, and that, after the repayment of all the ex-
penses incurred by the lessees, the profits from the ores
should be shared alike by lessor and lessees. There is a
limitation placed upon the operating expenses to be incur-
red by the lessees. A system of monthly accounting is pro-
vided for. We agree with counsel for respondent that the
forfeiture of the lease or contract for nonperformance of
the conditions or for abandonment of the contract is at the
election of the lessor. But it is further urged that it is
undisputed that appellants covenanted to put improve-
ments upon the mining property, and that they have
failed to perform this agreement; that the consideration
for such covenants to appellants was the possession of the
property, and the right to work it; that such consideration
was certain; that respondent paid such consideration, and
that thus the measure of damages given by the court was
correct. In support of this contention a number of authori-
ties are cited. Several railroad right of way cases have
been examined, of which the leading one of *Taylor v.
North Pacific Coast R. R. Co.,* 56 Cal. 317, illustrates the
proposition. There the owner of a tract of land granted
a right of way over it to a railroad company; the latter
covenanting, in consideration therefor, to build for the
land owner a wagon road in lieu of one destroyed by the
railroad company, and also to fence both sides of the way

granted, with a good and substantial fence, and thereafter to maintain such fence. The company failed to construct the road or build the fence, and the action was for breach of the covenant. The trial court allowed the plaintiff to prove and recover the estimated cost of constructing the road and building the fence. This was approved by the supreme court, and that court observed:

"The building of the road and fence was a part of the consideration for the grant. The defendant chose to stipulate for the payment of the consideration in this way, and we cannot see why it is not as much bound to perform its agreement as if it had stipulated to pay in anything else. Suppose, for instance, it had agreed to deliver to plaintiff, as a part of the consideration for the right of way, a thousand-dollar United States four-per-cent. bond, and then refused to keep the covenant. Would any one doubt that the plaintiff could maintain an action for its breach, and recover, as the measure of damage, the value of the bond? We see no difference in principle between the case supposed and the present one. Here the agreement was to build a certain road and a certain fence. Failing to build them we think defendant should be made to pay what it would reasonably cost to construct them."

See, also, *Logansport, etc., R. Co. v. Wray,* 52 Ind. 578; *Cincinnati Southern R. Co. v. Hudson,* 88 Ky. 480 (11 S. W. 509); *Cincinnati & Springfield R. Co. v. Village of Carthage,* 36 Ohio St. 631; *St. Louis, J. & C. R. R. Co. v. Lurton,* 72 Ill. 118; *Gathwright v. Callaway County,* 10 Mo. 412; *Wilson v. Graham,* 14 Tex. 222; *Mayor, etc. v. Second Ave. R. R. Co.,* 102 N. Y. 572 (7 N. E. 905, 55 Am. Rep. 839); *Strutt v. Farlar,* 16 Mees. & W. 249.

It may be observed of the reasoning in *Taylor v. Railroad Co., supra,* that an actual consideration had been paid; that is, the right of way had been granted. It is also inferable that the erection of the fence, and its main-

tenance, and the building of the road, were permanently valuable to the plaintiff, the owner of the land, and the measure of damages was correctly stated upon the facts of the case. And so of the other cases of a similar nature above mentioned. The specific payment of a consideration entitles the one who pays to the thing paid for or contracted to be done, or damages in default of the doing thereof. But the cases mentioned are essentially different in the facts shown from the case at bar. What was the consideration for the lease of the mining property? It cannot be said that any material consideration of specific amount or ascertained value was paid by the lessor. The substantial consideration moving the lessees to enter into the contract was the ores that were supposed to exist in the undeveloped mine, and it may with equal reason be inferred that the substantial inducement to the lessor to make the contract was its share of the profits to be derived from the development and working of the mine during the term of five years by the lessees. It was not in contemplation that the lessees should ultimately pay for the costly machinery, the construction of the tunnel and other things mentioned in the contract. These expenditures were to be advanced by the lessees, and they were to be reimbursed from the ores taken from the mining claim. But if, as alleged by the lessees, after development and examination, the ore is worthless or cannot be profitably mined, it is apparent that further expenditures would be valueless to either lessor or lessees. Under these circumstances, in any reasonable view, the mine must be abandoned. But, again, it is maintained by the learned counsel for the respondent that it is immaterial whether the mine contained mineral in paying quantities or not; that in case of the abandonment of the contract, the measure of damages is exactly the same whether it was rich in mineral or

barren. Several oil-land cases from Pennsylvania are cited, some of which may be examined, and, we think, fairly distinguished from the case under consideration. *Springer v. Citizens' Natural Gas Co.,* 145 Pa. St. 430 (22 Atl. 986). In this case an oil and gas lease contained a covenant that the lessee should complete a well within a certain time, or thereafter pay the lessors certain sums semi-annually until such completion, and stipulated that the failure to complete the well or make such payments should render the lease void. But an examination of the opinion in the case discloses that the amount of damages for failure to sink the well within a specified time was stipulated between the parties, and the court observed:

"The rule adopted by this court in *Holmes v. Nat. Gas Co.,* No. 123, June Term 1890, is not applicable here. In that case, the lessor was to be paid only for oil or gas actually found and used. While there was a covenant that the lessee should drill a second well, it was not stipulated that anything should be paid for failure to do so; hence, the only way in which the plaintiff could possibly prove any damages, was by showing that there was oil or gas in his land which could and would have been obtained and utilized by putting down another well. In the case at bar, however, the damages for delaying to drill are fixed and liquidated by the parties themselves in their agreement."

In the case of *Gibson v. Oliver,* 158 Pa. St. 277 (27 Atl. 961), it was said of a similar contract:

"The manifest purpose of the lease was to test the demised premises for oil and gas purposes by putting down two wells thereon. This was not done, nor was it even attempted."

It also appears that the damages were stipulated. So, in *Cochran v. Pew,* 159 Pa. St. 184 (28 Atl. 219), a similar conclusion was reached upon the authority of the pre-

ceding decisions. But in an oil-land contract before the court in *Bell v. Truit,* 72 Ky. 257, it was observed:

" . . . it not appearing from the evidence that the appellee would in any reasonable probability have been benefited by a compliance with the undertaking to commence operations by boring or mining for oil on his land, he should in no event have recovered more than nominal damages for the breach of appellant's covenant; . . . "

It is a cardinal principle in the measurement of damages that the party injured shall receive compensation commensurate with his loss or injury, and it is the right of the person who is bound to pay the compensation not to be compelled to pay more than compensation and costs. It will be observed from an examination of the contract under consideration here that no reasonable inference of liquidated damages is gathered from its expressions. In this regard it differs from the coal-land contracts before the supreme court of Pennsylvania in the cases before mentioned. The case of *Colorado Fuel & Iron Co. v. Pryor,* 25 Colo. 540 (57 Pac. 51), seems to be pertinent and applicable to the present controversy. In that case there was an undivided one-half interest in designated coal land, and the contract provided that the lessee for a definite period should enter upon the demised premises, and work them in the manner necessary to a good and economical mining of coal; that the work should commence an a specified date, and be prosecuted with reasonable diligence. The lessee was required to pay a fixed royalty on each ton mined. The plaintiff alleged that the lands contained large and valuable deposits of merchantable coal, which could be worked and extracted at a profit by the expenditure of money; that under the lease the lessee entered on the premises, opened up a vein of coal, and had since re-

tained possession, and, by the exercise of reasonable diligence and the expenditure of a reasonable amount of money, could have extracted from the mine and premises a thousand tons of coal a day; that defendant had failed to use reasonable diligence, or put the premises in working order for the mining of coal, but, on the contrary, had ceased operations, and discontinued all efforts to prosecute mining on the lands. The defendant answered, denying that the lands contained coal of a merchantable quality, or that, by the exercise of diligence or by the expenditure of a reasonable amount of money, it could have extracted and mined coal from the lands at a profit. To this defense a demurrer was sustained by the trial court. The appellate court, in reversing the ruling upon the demurrer, observed:

"The party seeking to recover substantial damages for breach of a contract must establish the facts which entitle him to such recovery.   .   .   .   In construing a contract, the first point to ascertain is, what the parties meant, understood and intended, as determined by the words employed   .   .   .   and, as an aid in this respect, the situation of the parties, and the facts and circumstances surrounding the transaction at the time of the execution of the contract, as, also, its subject matter and the object of the parties in making it, may be taken into consideration.   .   .   .   The premises were demised expressly for coal-mining purposes. They were not then, nor are they yet, in shape to produce. Whether they could be successfully operated as a coal mine depended upon future development. By the transaction the lessor expected to receive compensation in the way of royalty, and the lessee profits from the operation of the leased premises as a coal mine; so that the benefits thus realized would be mutual. Unless coal was found of a merchantable grade which could be produced at a reasonable profit, or if that discovered was valueless, to require the lessee to mine it and pay royalty on the production would im-

15—28 WASH.

pose a burden without any benefits in return. The obligation was imposed upon the lessee to open the premises as a coal mine, and operate them as such; but, in the absence of express provisions in the lease regarding what conditions should exist before a penalty would attach for a failure to observe this obligation, or under what circumstances it should comply with this provision, the law presumes that the parties to the lease, at the time of its execution, considered the purpose for which it was executed and the conditions under which it would be mutually beneficial to carry out its terms and provisions, and, therefore, intended by the language employed to contract accordingly. 2 Parsons on Contracts, *499. The right to mine having been granted, the law implies that the lessee should exercise reasonable diligence in working the mine (*Koch's Appeal,* 93 Pa. St. 434) ; but unless coal actually existed on the premises of a merchantable grade, which could be produced at a reasonable profit, or, if none existed, or that which was found was valueless, then, under this contract of lease, it would be under no such obligation."

It is concluded that the rule for the measurement of damages announced by the superior court was erroneous; that the basis of the assessment must be compensation of the plaintiff for whatever loss it may have sustained by reason of the non-performance of the contract by the defendants. If the mine in fact was tested, and the ores extracted therefrom are without commercial value, it would seem that the loss to plaintiff could not be substantial. If upon trial it is shown there is reasonable probability that ores can be taken from the mine at a reasonable profit, and what quantity can be reasonably produced under the terms of the contract when performed, the profits on plaintiff's share of the ores so derived from the mine should then be the measure of plaintiff's damages. What is here determined is that upon the case as

it appears now, plaintiff is entitled to such damages as can be ascertained, and flowing from the non-performance of the whole contract, and such elements of damage must be established by the plaintiff as compensatory for its loss.

The judgment is reversed, and the cause remanded for further proceedings in accordance with these conclusions.

WHITE, FULLERTON, HADLEY, MOUNT, ANDERS and DUNBAR, JJ., concur.